# McMANUS *v.* HAMMER.

PATENTS; INTERFERENCE; WITNESSES; ORIGINALITY; CONCEPTION, DISCLOSURE, AND REDUCTION TO PRACTISE.

1. The failure of a witness in an interference case, in testifying as to a disclosure to him by the party calling him, of the invention of the issue, to couch the disclosure in technical terms, adds to, rather than detracts from, his testimony.

2. In an interference involving an improved bottle and jar closing device, where the question was one of originality, a decision of the Commissioner of Patents awarding priority to the senior party was *reversed* upon a review of the evidence; from which it appeared, among other things, that the junior party, who had much greater knowledge of the art than the senior party, and had patented several bottle closing devices, had been working on the invention of the issue for sometime, and conceived it in the city of New York before he was joined there by the senior party, who there became his roommate, and who admitted that he had no conception of the invention until after that time; that a model which the senior party claimed was made for him was actually made for the junior party, who paid for it; that shortly thereafter the junior party had a bottle made involving the invention of the issue with his name impressed upon it from the mold from which it was made; that, in pursuance of an agreement between the junior party and persons interested, including the senior party, in the exploitation of the invention, whereby the junior party was to apply for a patent and assign the invention in trust to them, for them and himself, he caused an application to be prepared for filing in the Patent Office, and executed it, but that it was not filed, but the same attorneys who prepared it subsequently prepared and filed a similar application in the name of the senior party; and that the claim of the senior party that the junior party was present when he, the senior party, executed his application, and understood it was for the invention of the issue, was not substantiated by the evidence.

No. 748. Patent Appeals. Submitted January 11, 1912. Decided February 5, 1912.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Reversed.*

The facts are stated in the opinion.

*Mr. W. R. Spooner* for the appellant.

*Mr. Hugh M. Sterling* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

This is an appeal from a decision of an Assistant Commissioner of Patents in an interference proceeding, awarding priority of invention to Charles E. Hammer, the senior party and patentee. The patent to Hammer was inadvertently issued, as the Charles McManus application was on file at the time.

The invention is a comparatively simple one, easily understood, and relates to an improved bottle and jar closing device. Part of the claims cover a dished disk, which is nothing more than a piece of paper or cardboard cut round to fit snugly into the top of the bottle neck, and a so-called rabbeted portion of the bottle, which expression, reduced to common phrase, means that the inside top portion of the neck is cut out sufficiently to admit the disk, so that when the bottle cap is screwed down the disk will be about even with the top of the bottle; in other words, a little shoulder is made in the inside of the neck, upon which this disk rests. Another feature of some of these counts relates to the form of the top of the bottle cap, which is required to be depressed, so that when the cap is screwed down the depression will come in contact with the dished disk and, of course, force it tightly into place. The other set of counts relates particularly to the cap, and the manner of applying it to the bottle. Under these counts the cap is required to have a plurality of inclined notches at its lower edge, which in practice simply means that the lower edge of the cap is bent inward in a plurality of places, so that the projections thereby produced will engage the separated threads which these counts required to be formed on the exterior of the bottle, and which threads run slantingly downward to a shoulder. The counts of the issue are six in number, but counts 1, 2, and 4 fully illus-

trate the different features of the invention, and are here reproduced:

"1. A bottle or jar having a rabbeted portion, a dished disk adapted to fit said rabbeted portion, and a cap adapted to flatten said dished disk to increase its diameter.

"2. A bottle or jar having a rabbeted portion, a dished disk adapted to fit into said rabbeted portion, and a cap having a depression in its end adapted to flatten the dished disk to increase its diameter."

"4. A bottle or jar provided with an annular shoulder and a plurality of superposed separated threads connecting at their lower ends with said shoulder, in combination with a cap having one or more impunched projections at its lower edge to engage said threads, said projections being provided with inclined upper walls having an annular arrangement with relation to the lower edge of the cap conforming to the annular arrangement of the threads with relation to the shoulder, whereby stops are provided at the junction of the threads with the shoulder to limit the turning movement of the cap, the relative annular arrangement of the parts being such as to adapt the cap to be screwed down into close contact with the shoulder so that the inclined upper walls of the projections and basal edges of the inner walls thereof will respectively bear against the threads and shoulder, and exert resisting pressures to prevent injury to the projections when the cap is screwed on."

The real question involved is that of originality. Although we have carefully examined the entire record, which is needlessly long and involved, we will content ourselves with a statement of what we conceive to be the material facts. McManus, prior to the events culminating in this controversy, had for some time interested himself in bottle closing devices. On January 27, 1904, he applied for a patent on a rim with annular grooves and a cap to fit the grooves. This application was allowed June 14, 1904, as patent No. 762,745. His next application was filed May 24, 1904, and was granted as patent No. 772,250, on October 11th following. On June 3, 1905,

he filed an application on a device similar to the one in issue, the essential differences being that the separated threads ended in a horizontal groove, instead of a shoulder, and the inside of the neck was not rabbeted. The notches in the lower part of the cap in the earlier device were straight instead of inclined, —a mechanical detail. While Hammer applied for a patent other than the one in issue on May 22, 1905,—which, so far as the record discloses, was never granted,—it is clearly apparent that McManus possessed far greater knowledge of the art than he. They were both young men, and had been acquainted in Baltimore, Maryland, for some time.

At the end of May, 1904, McManus, who had been working in Philadelphia, went to New York and engaged board and room with a Mr. and Mrs. Furness. The evidence is clear and convincing that he was then busily engaged in developing his ideas relative to bottle closing devices. McManus testifies that after he had applied for his second patent, he conceived the invention in issue, and that in June of 1904, he made a drawing or sketch of his invention; that he took this drawing to the Demuth Glass Factory, in Brooklyn, and exhibited it to the foreman, a Mr. Dries, who referred witness to a Mr. Shields, since deceased, the mold maker of the factory, and to whom McManus showed his drawing. McManus also left with Mr. Shields a model which he had filed out of a bottle neck or piece of wood. Mr. Shields was unable to make a bottle embodying the invention. This drawing and model were not preserved by the factory, so that McManus was unable to produce them in evidence. While Mr. Furness subsequently became financially interested in stock companies which McManus organized to exploit his inventions, his testimony and that of his wife, being consistent and evidently given in perfect good faith, is entitled to consideration. Soon after McManus had taken a room there, at the end of May, 1904, Mr. Furness interviewed him for the purpose of ascertaining his business. McManus, according to the witness, informed him that he was an inventor of bottle caps, and thereupon submitted "various samples of caps in brass and tin." Wit-

ness becoming interested, McManus exhibited to him a crude drawing of an invention which he said he had just made. McManus explained this invention. The witness states "that the groove or ribs on the outside of the top of the bottle was run down to the shoulder, and the notch in the cap was beveled slightly, so that he (McManus) stated that the bevel in the notch would fit the groove on the outside of the bottle. And at the top of the bottle he was to have a little groove, and was to have a piece of paper or cardboard cut full so that it would belly up, so that when the cap was put on it would force the paper tight against the sides of the bottle and make a complete seal, as he termed it, and the cap was dented so that it would catch this washer in this ridge at the top of the neck of the bottle." This description, it will be noted, fairly describes the invention. It is suggested by one of the tribunals of the Patent Office that this witness failed to locate the projections *at the lower edge* of the bottle cap. It would be too great a reflection upon the intelligence of McManus to assume that he would have placed them anywhere else. The failure of this witness to couch his description in technical terms adds to, rather than detracts from, the weight of his testimony. It is apparent that he fully understood the result sought to be accomplished and the manner in which it was to be attained. Mrs. Furness also testified to having seen the drawing referred to by her husband, and as to her recollection of the description which McManus gave her of the features of his invention. The testimony of these witnesses is important, as Hammer admited in his cross-examination (cross-questions 1371 to 1380), that he had no conception of any feature of the invention until some time in September, 1904, which was after he had gone to New York and had commenced to room with McManus.

McManus had a wooden model made (McManus Exhibit No. 4), in the early spring of 1905, by Edward Collins, a pattern and model maker of Brooklyn. This model shows the separated threads, and is rabbeted on the inside of the neck. Hammer testified that this model "showed an *annual* rib or shoulder with threads going into the shoulder on an in-

cline; it was also provided with a rabbeted portion in its top." The drawings, Hammer further testified, showed "a cap having a depression in its top with inclined notches at its basal edge, also a dished disk to fit into the rabbeted portion." Hammer testified positively that it was he who had this model made. Unfortunately for Mr. Hammer, however, Mr. Collins—an entirely disinterested witness—disclaims ever having seen him, and is positive that the model was made for McManus from a sketch furnished by him; that the witness knew no one else in the transaction. Further corroboration is found in the receipted bill which McManus produced, and which was identified by Mr. Collins. Mr. Collins, under cross-examination, was asked how he was able to remember this particular model, and replied: "He (McManus) had some patent wafer that he put on top, that is why it impresses itself on my memory." He was further asked, under cross-examination, whether, at the time this model was made, he came in contact with Mr. Hammer, who was thereupon pointed out to him. The witness did not remember ever having seen Hammer. The Collins model was also exhibited to Mr. Shields, who, however, was unable to make a bottle like it.

Some time in June of 1905, McManus and Hammer were in Baltimore, and, at the latter's suggestion, interviewed a Mr. Donahue, a manufacturer of models for glass. Donahue testifies that they appeared as representatives of the McManus Manufacturing Company. A tool was procured of Mr. Donahue which McManus took to the Nivison Glass Factory, in Baltimore, where an imperfect bottle was produced. This tool McManus says he changed, or caused to be changed, so that a perfect bottle embodying the invention was produced. Hammer, according to the testimony of McManus, had then returned to New York. The Patent Office was not satisfied that a perfect bottle was produced at this time, for the reason that Donahue, testifying concerning the tool which had been in Hammer's possession, said it would not produce such a bottle. But the man who produced the bottle, and who is a disinterested witness, testified positively concerning it, and his

testimony fully corroborated McManus. Mr. Jackson, secretary and one of the directors of the Nivison Company, testified to the making of the first bottle, which is an exhibit in the case; that the bulge in the tool was changed so as to "put a small edge in the inside of the rim of the bottle neck;" that the bottle then produced was perfect, having outside threads that ran down to a shoulder; that the mold from which this bottle was made caused McManus's name to be impressed upon the bottle. The witness further stated that his work was all done at the direction of McManus, and that he had never seen Hammer until the morning of the day he testified. Mrs. Furness, in her testimony given before this witness was called, mentioned seeing a bottle not long after McManus returned from Baltimore with McManus's name on it; that this feature particularly attracted her attention. Mr. Donahue, called by Hammer, remembers that he made such a name plate for the mold in question. Mrs. Furness testified that this bottle finally disappeared, and it is the contention of McManus that Hammer was responsible for its disappearance. The description which Mrs. Furness gives of this bottle tends to corroborate the testimony of Mr. Jackson and of McManus relating thereto.

McManus further testifies that it was finally determined to form a company, composed of McManus, Hammer, Furness, and a Mr. Specht, to exploit this particular invention; that it was agreed that McManus should apply for a patent and assign his invention to Hammer, in trust for the interested parties; that in accordance with this understanding and agreement, McManus, accompanied by Hammer, on about July 7, 1905, went to the New York office of Evans, Wilkins, & Company, a corporation organized under the laws of Virginia, and having its principal place of business in Washington, District of Columbia; that under McManus's direction, Hammer having left the office, the application and drawings were prepared, and that McManus then executed the application. That such an agreement was entered into, and that what was done by McManus upon this occasion looking to the filing of the appli-

cation was in pursuance of that agreement, is testified to by Mr. Furness and by Mr. Spooner, an attorney who was consulted and who represents McManus in this proceeding. Without reviewing the testimony of either Mr. Furness or Mr. Spooner in reference to this feature of the case, we deem it sufficient to state that we find the fact to be that such an arrangement was entered into as testified to by them.

Evans, Wilkins, & Company had previously represented McManus in patent matters. The application which McManus says he executed in their New York office on the date mentioned was not filed. Subsequently, on July 28, 1905, the same application was executed by Hammer in the Washington office of the Evans company and filed in the Patent Office. McManus contends he knew nothing of this. We will advert to this question later. It appears that some time in February, 1906, Mr. Spooner came to Washington for the purpose of investigating the McManus applications, and learned for the first time of the Hammer application. He testified that he discussed the matter with Mr. Evans of the Evans company, giving Mr. Evans the complete history of the case; that upon his return to New York Hammer declined to recede from the position he had taken, saying that he had fixed the matter up with Mr. Clark, who was then in charge of the Evans company's New York office, so that the application could be made in his (Hammer's) name, instead of in that of McManus. Mr. Spooner, accompanied by McManus, again came to Washington early in May and interviewed Mr. Evans. The history of the case was again gone over, and Mr. Evans suggested that it would be necessary for McManus to make an application, which would be placed in interference with the application filed by Hammer. Mr. Evans admits that he agreed to take charge of McManus's case and act for him. Accordingly, McManus's application was prepared in the Evans company's office, being a duplicate of the application filed by Hammer. This application was prepared under the direction of and witnessed by Mr. Sterling, counsel for Hammer in this proceeding; and right here it may be stated that Mr. Sterling was a stockholder

and one of the five directors of the Evans company, and close-
ly connected with that company, representing it in interference
and infringement cases.

Upon the filing of the McManus application, McManus and
Mr. Spooner again came to Washington and again interviewed
Mr. Evans. The case was again carefully discussed and all
the information in the possession of McManus or Mr. Spooner
was freely given to Mr. Evans. Upon being informed as to
the fees that would be charged by the Evans company in tak-
ing the testimony in the interference proceeding, Mr. Spooner
represented to Mr. Evans that McManus would be unable to
meet such an expense; that it would be necessary for him
(Spooner), although not familiar with patent cases to attend
to the taking of the testimony, but that the Evans company
should continue as counsel in all matters outside of that. This
arrangement was assented to by the Evans company, as Mr.
Evans admitted in his testimony. Without going into further
details, it is sufficient to say that after the preliminary state-
ments had been filed, the Evans company withdrew as counsel
for McManus, but Mr. Sterling appeared as counsel for Ham-
mer.

We will here give a brief summary of Hammer's case: We
fully agree with the Patent Office that Hammer has shown no
conception of any of the counts of the issue prior to the alleged
execution by McManus of the application of July 7, 1905.
His case depends almost entirely upon the testimony of mem-
bers and employees of the Evans company. Mr. Clark, who
was then in charge of the New York office of the company, says
he "was given to understand" that Hammer was the inventor.
He fails, however, satisfactorily to explain how it happened
that McManus's name was placed at the top of the specifica-
tions by the stenographer to whom he dictated them, in accord-
ance with the custom of putting the name of the inventor in
that place. This name was subsequently erased and Ham-
mer's inserted. It is also strange that McManus should have
been the one to explain the invention to the draftsman. To
be sure, the draftsman testifies that Hammer subsequently

criticized the drawing and required some changes in it. We do not attribute much importance to this testimony, however.

Coming now to the testimony of Mr. Evans and Mr. Sterling, they both state that McManus was present when Hammer executed his (Hammer's) application, and understood that it was for the invention in issue. They both testified positively (Sterling with great detail) that Hammer then paid the fee of $30 for that and another application executed by McManus and covering a notching device. As to the latter statement, McManus produced a receipt in his name for the money which he said he paid for his application and a balance due on a prior one; as to the former statement, it is very significant that, although Mr. Sterling had testified that Mr. Spooner, at one of the interviews leading up to the preparation and filing of the present application, was informed that McManus was present when the Hammer application was executed, Mr. Evans, when asked the direct question by Hammer's counsel,—Mr. Sterling,—whether he had so informed Mr. Spooner, answered equivocally, and stated that he had said to Mr. Spooner that McManus "should have asserted his claims at the time the application of Mr. Hammer was *filed."* It is equally significant that Mr. Evans testified that in one of those interviews McManus, exhibited to him the McManus copy of the original specifications, and then "stated that a mistake had been made in the filing of the application, that it should have been filed in his (McManus's) name instead of Mr. Hammer's." Mr. Spooner, in his testimony, categorically denied that Mr. Evans even made the remark that McManus should have asserted his claims at the time the Hammer application was filed. He was equally positive that no suggestion was made by Mr. Evans, "or anyone else in any of the interviews there, that Mr. Hammer's application was made in Mr. McManus's presence, or that Mr. McManus had knowledge of it at the time." On the contrary, that McManus had stated to Evans that he, McManus, knew nothing of the execution of that application, and that Evans had confirmed the statement. The failure of Evans to speak when reason and duty required him to speak

tends strongly to show that his subsequent recollection while testifying for Hammer was at fault. The testimony of Mr. Sterling, when considered in the light of the surrounding circumstances as disclosed by this record, loses much of its probative force.

We think Mr. Evans and Mr. Sterling have confused this Hammer application with some other; but, even assuming that their recollection is correct, the record leaves no room for doubt in our minds that McManus is the real inventor of these claims and each of them, and that the award should have been in his favor. He well may have thought that the trust arrangement with Hammer fully protected his interests.

The decision is reversed, and priority awarded McManus.

*Reversed.*